Good morning everyone. The first argued case this morning is No. 17-1131, v. Apple Inc. Mr. Tanofiyev. Your Honor, and may it please the Court. The patent trial and appeal board's decisions below should be reversed for at least three reasons. First, the board improperly assumed the publication date of a reference in the absence of requisite documents. Second, the board inexplicably switched its initial inherency theory with a new theory lacking evidentiary support. But on the publication issue, maybe we can dispose of that. Didn't the burden shift to come forward with a date explicitly written on the record? Well, whose burden is it? Your Honor, we think that actually on the Dynamic Drinkware and we think that on the Indra Magnum, the burden remains on the patent challenger to introduce evidence that the printed publication was publicly available on a certain date. So our position is, as we said particularly in the brief, that the burden never shifted to VernetX. Well, it said right on its face what the date was. And there was another publication that showed the procedure whereby this organization produces its documents. Your Honor, the RFC-2041 says nothing as to what the date refers to, whether it's initial draft or whether it's a final version. The process document, RFC-2026, says nothing about the date on the cover of an RFC. The only reference in 2026 to a date is to a copyright date. But this court held that copyright date by itself. Well, there was more than a copyright date. The top said November 1998. It also said distribution for this memo is unlimited. Yes, but, Your Honor, but that statement addresses the scope of the distribution. So once actually that document is publicly released on a particular date, indeed, it will be distributed without limitation. It doesn't address the question of when it was publicly available. So there is no evidence, no competent evidence that was introduced what exactly that date in fact means. But isn't it prima facie evidence which shifted the burden to show that it was not available? Your Honor, we don't think that it really, it even rises to the level of a prima facie evidence. We think that the prima facie evidence has to be something strong. It has to be some corroborating evidence as to what that particular date is. And the only evidence that Apple introduced and that were considered was the evidence of its expert. So if I buy today's New York Times and it has a date on it that I still have to show something or other 10 or 20 years later? No, Your Honor, I think with the New York Times you will have the actual publication. But if you introduce just a printout with a particular date and no evidence as to when, then what is the practice of the organization with respect to that date? I mean, with New York Times there is at least historical practice that the date appears on the cover, underneath the logo. With respect to the RFC, again, our contention is there was no evidence as to what is the practice of the organization with respect to the date. And that's exactly the requirements that this Court has enforced. It enforced it in RICO, in Realista, in SRI International, that you need to introduce competent evidence of the organization's practice. Okay, so we interrupted you. Let's go on to your other points. And I will just, just one more point on the print publication to finish the thought. Indeed, we do agree that Apple tried to introduce evidence that potentially could establish such practice and tried to introduce the declaration by the RFC and its representatives. We challenged and we think that we have a good basis that that evidence was inadmissible and also not probative. But even as this Court thinks that there may be some other evidence that could establish the practice of the organization, the proper course is really to remand to the Board so that the Board can actually properly assess that evidence. Okay. But turning to the second issue, the second issue relates to the proceedings based on Bezaer. And in those proceedings, the Board committed two errors. First, at Apple's urgings, the Board initially invoked an inherency theory to find the Bezaer disclosures that claim broadband limitation. And it relied on the testimony of Apple's expert that the cable in the modem in Bezaer can transmit modulated signals. Counsel, you're arguing the obviousness rejection. I assume you're familiar with patent practice. There's a duty of disclosure which requires an applicant to disclose references material to the patentability of the invention. There are 70 columns of references cited here, which shows that it's a very crowded field. The applicants obviously presumably felt, if they were acting properly, that all of these references were material to the patentability of the invention. Why isn't it very clear, then, that these claims are very obvious? Your Honor, we only, with respect to Bezaer, we only actually, our appeal is limited to just four claims. And these concern two limitations. They concern the broadband limitation. But I'm talking about the citation of 70 columns of references, which looks like the applicants were trying to obscure the nature of the prior art and not comply with the duty of disclosure. Your Honor, we don't think that that was the case at all. And actually, what we are... Why were 70 columns of references cited? Your Honor, I can't... That doesn't help the examiner. Your Honor, but I think the examiner... The evidence that was submitted to the examiner was the evidence that we believe the examiner had to have. And if you also look at the Aventail, I mean, the examiner did... The examiner initially rejected some of the claims. We submitted clear, what we argue is clear disclosure to the examiner that allowed the claims. So I think that was a typical patent process that was going on in this case. But just, Your Honor, if I may turn just to focus the Court's attention on these two limitations. With respect to the broadband limitation, the Board initially adopted the inherency theory because there was no testimony, no expert testimony that expressly discloses the separate channels in the modulated transmission link. And that was a necessary element of a claim broadband limitation. There was no dispute about it, and the Board's decision mentions that. In the final decision, however, the Board asserted that inherency was not necessary to find obviousness. And the Board, therefore, not only impermissibly switched the obviousness theories, but that second obviousness finding is also completely unsupported by evidence, because you had to have expert evidence that Beza also disclosed separate channels. The second point on Beza concerns the Board's finding that just because the originating device in Beza can be a web TV or multimedia device that's capable of connecting to a server, that necessarily means that the terminating device in Beza also must be a server. The only evidence on which the Board relied was evidence by Apple's expert who testified that the web TV device could be used to connect to a server. But that evidence cannot support the finding that the web TV necessarily would so connect, and therefore cannot support the inherency finding that the terminating device in Beza was disclosed as a server. Turning to the third issue that we want the Court to address, the third issue is the direct requirement in Aventail. And in the proceedings based on Aventail, the Board impermissibly disregarded Vernetics' prior prosecution history disclaimer when construing three related patent terms. During the prosecution of a related patent, Vernetics disclaimed non-direct communications that were disclosed in Aventail, the very same reference that is at issue here. The PTO in that proceeding allowed claims as a result of that disclaimer. Apple itself then described that disclaimer in a district court proceeding as unambiguous, as a clear mandate to the patent office. But they provided an alternative argument. Did they not, accepting the disclaimer? Was that not for that reference? Ioanna, if you're referring to Vernetics, there were several arguments that Vernetics provided in the district court. In the district court, Vernetics in fact challenged whether or not that disclaimer should be enforced. Vernetics lost at that point. So the district court's opinion, both Apple's brief, its description of a disclaimer as unambiguous is very clear. And I can provide citations for the court. That's actually on Appendix 23, 995 and 96. And the district court, in its opinion, enforced disclaimer, finding that the disclaimer with direct connection in Aventail was clear and unambiguous. The test, Ioanna, the test for when disclaimer is unambiguous is whether a patent owner's competitors would believe and would view the disclaimer as unambiguous. There can be no stronger evidence of a clarity with disclaimer than the fact that Apple itself, in a proceeding against Vernetics, described the disclaimer as unambiguous and successfully enforced it. The board's main reason for actually rejecting the disclaimer is because purportedly, the board said that Vernetics purportedly could not define what was meant by the direct communication. That was first of all incorrect because Vernetics explained to the board that the construction referred to direct addressability. And importantly, Vernetics' expert testified that because the communication path in Aventail is relayed through the SOC server, the Aventail server, one of ordinary skill and the art would understand that this is not a direct connection between the client device and the remote host. So there was explanation what direct meant. There was supporting expert evidence. And actually, this court in Cisco, although it didn't have reason to construe Aventail, the claim term direct communication, it certainly applied the district court's construction of direct and it had no trouble understanding what that particular term meant. And in any event, even if there is some doubt about the precise definition of direct, what Vernetics disclaimed here was precisely the type of a non-direct communication that is disclosed in Aventail. Therefore, at the minimum, Vernetics' disclaimer extended to the scope of Aventail. And for that reason, the board's conclusion that, the board's resulting conclusion that even irrespective of the proper claim construction, Aventail disclosed direct communication just makes no sense. So this court should correct the board's construction of a direct communication and should then reverse the board's findings that Aventail, in fact, disclosed the direct communication. Unless there are questions, I will. Okay, good. Thank you. We'll save the rest of your time for rebuttal. Thank you. Mr. O'Quinn. Thank you, Judge Newman, and may it please the court. John O'Quinn on behalf of Apple. As my colleague noted, I think the principal issue in these IPR appeals is whether the board was entitled to find as a factual matter that RFC 2401 was publicly accessible prior to the critical date where Apple introduced evidence relating to the RFC practices. But Vernetics presented no evidence whatsoever that it was not publicly available or accessible as of the date on the face of the document. That issue, of course, is dispositive as to three of the five patents at issue in this proceeding and all but six of the claims of the remaining two patents. And because those six remaining claims add obvious limitations that are suggested in the Beezer reference itself, the board need not reach any of the issues that my colleague was talking about at the end relating to claim construction. That only applies in the two Aventail proceedings and need not reach any of the issues that relate to Aventail. Just very briefly, an RFC 2401, of course, is a request for comments on a standard proposal by the Internet Engineering Task Force, a well-known standard-setting organization for Internet protocols. That reference has been asserted in a variety of proceedings where Vernetics did not contest its prior art status, including in the ITC, including in re-exams, including in this court, and with good reason. Of course, the whole purpose of a standard-setting document is for the public to be able to use it to facilitate interoperability, as this court has recognized in Kyocera, and a request for comments by its terms invites timely public feedback. The board relied on the indicia of public accessibility in 2401 itself. It relied on the uncontroverted testimony of our expert, who is a person of ordinary skill in the art, who testified as to his basis of familiarity with RFC practices, and relied on RFC 2026, a corroborating document by the Internet Engineering Task Force that talks about its protocols and procedures. And there was no evidence to the contrary? And there was no evidence offered to the contrary, and there's reason for that, Judge Lurie, because there's really ultimately no question that RFC 2401 was publicly accessible as of November 1998. That is what the declaration, for example, of Ms. Genoza, which the board admittedly did not rely on, but she was the RFC editor going all the way back to 1999 prior to the critical date. She testified, or provided, there's a declaration from her that indicated that it was publicly accessible as of the date on the face of the document, and certainly prior to the critical date. And indeed, you can look at a variety of corroborating things that confirm that, all of which was available to the board, and there was no evidence, no evidence whatsoever to the contrary. If the court has questions on this issue, of course, I'm happy to address those. But between the document itself, the corroborating RFC 2026- Why don't you deal with the other six claims? Sure, I'd be happy to. So let me first turn to the issue that I think that my colleague was most focused on, which was the issue of whether or not the board changed theories with respect to two of the claims. And this affects only two of the claims, Claim 4 and 26 of the 8705 patent. The other claims, Claims 14 and 31 of the 8705, and Claims 13 and 28 of the 0705 patent, those just require that the target device be a server. The board found that it would be obvious to a person of ordinary skill in the art that you could use the invention with a server. After all, a server is just a computer that provides content or information to a client device that asks for it. It's a concept that's as old as computing. If you load a web page, that information, when you look on the Internet, it's coming from a web server. If you download music or video, it's coming from a server. And as the board observed, the user specifically contemplates that the network devices, such as web TV sets, interactive video games, personal computers, and such, they have to get the content from somewhere. That would be obvious. Vernetica's only argument about that is that this is somehow actually an inherency issue, but that argument doesn't really follow, and I didn't really hear my colleague addressing that significantly today. His main focus was on the broadband limitation, which affects, as I said earlier, Claims 4 and 26. And the only challenge that they've made to the board's finding that those two claims are obvious is to argue that the board somehow changed theories from institution to the final written decision. But the fact is, nothing changed. We didn't argue inherency. We argued in our petition that RFC 2401 in combination with Beezer rendered those claims obvious, and we relied in our petition on paragraph 80 of Professor Thomasia's declaration to explain why the use of a cable modem on a cable network was a broadband connection. It was Vernetica's that argued, well, this was necessarily an inherency argument, and Vernetica's that injected the idea that this was about inherency into the case. They didn't say that you changed theories. They said the board changed theories. I understand that, Judge Newman, and my point was only to say that what the board ultimately did is exactly what we asked the board to do in our petition. We made the same argument consistently in our petition, in our reply, and it's what the board instituted on the same references, Beezer, RFC 2401, and relying on our arguments about paragraph 80 of Professor Thomasia, and that's what the board relied on in its final written decision. What the board did in its final written decision was walk through the very argument that we had made in our petition, relying on the Beezer disclosure, relying on the reasoning in Professor Thomasia's declaration, paragraph 80, the same thing that we relied on in our petition, the same thing the board relied on at institution, and it walked through it, did its analysis, and concluded at the end of its analysis, it said none of this requires inherency, and that's not a change. What Vernetics is really arguing about is semantics. The teaching at issue, the disclosure of using a cable modem with a high-speed cable network, is all in the single reference of Beezer, and at both institution and the final written decision, the board relied on one paragraph in particular, paragraph 80 of Professor Thomasia, regarding what that reference teaches a person of ordinary skill in the art, and whether we label that inherency or not, in the context of what is an obviousness determination, is ultimately beside the point. This case, I think, is really indistinguishable from the Genzyme case, where the board, excuse me, where the court observed, quote, the board's final written decisions were based on the same combinations of references that were set forth in its institution decisions, and as Genzyme held, quote, there was no requirement for the institution decision to set forth every legal or factual issue that might arise, that's page 1366 of that opinion, and that's exactly what's gone on here. The board relied on the same evidence, the same argument, and it ultimately agreed with our argument, and simply, at the end of the day, rejected Vernetics' attempt to characterize that as being an inherency issue. There's certainly no question that Vernetics had notice as of what the issue was, because the arguments that we made, and that the board relied on at both stages, never changed. And to use an analogy from patent practice, certainly the thrust of the argument, if you're thinking about this and analogizing to whether there was a new ground of decision, certainly the thrust of the argument never changed. Was these recited in the patent office? Was it among the 70 columns of references which the applicant presented? Judge Laurie, I don't know for certain off the top of my head if it was, but I suspect that it was, given the number of references that were identified by the time that these five patents were issued. But were varied. I'm sure that it would have been hard to identify among the many references, but I'm not sure, but I believe it probably was, given the history here. I'm happy to answer questions if the court has them with respect to the remaining issues going to the direct limitation or Aventail. Suffice it to say, I think that the board is certainly entitled to conclude that there was no clear and unambiguous disclaimer when it couldn't get a straight answer from Vernetics as to what was purportedly in, and what is purportedly out in terms of direct and indirect limitations. And, of course, the board had before it a significant record of the history of these proceedings, including proceedings and re-exams in which Vernetics itself had argued that it had not done any sort of disclaimer. But as I said at the outset, the court need not reach any of those issues if it agrees with us with respect to the six limitations under Beezer. Because if it does, then Aventail is simply beside the point. On the theory that there was a disclaimer, and that all things considered, it should have been considered, where does that leave us? Well, I think... I'm thinking of, again, was the alternative argument presented? So, Judge Newman, if you were to think that there had been a disclaimer that should be enforced, despite Vernetics' inability to explain to the board and its inconsistent positions in litigation, and in front of the board, and in front of the patent office, but if you were to think that there were a disclaimer, and that the word direct should be read in, first, there is the alternative argument that Aventail itself discloses direct communications. Second, the arguments relying on the Beezer reference, of course, are entirely independent of this. And so, with respect to the Beezer reference, if you agree with us with respect to the six claim limitations, then that would be dispositive, and it wouldn't matter what the claim construction was, because the claim construction was not at issue in the proceedings that involve the Beezer reference. Even if you disagreed with respect to the six, it wouldn't matter as to all the other claims that would remain invalidated by Beezer. So, with respect to this direct issue, Judge Newman, there are really two different sets of alternative arguments. The first is that Aventail itself discloses direct communication for the reason that the board explained, that whatever Vernetics may have said to the patent office years ago, that has been proved to be inconsistent with its litigating positions, and what it argued was direct communication found to be infringing in the Cisco case. And the board, on the record in front of it, concluded on that record that Aventail did disclose direct communications. That's one alternative argument. And then the other alternative argument, of course, is that these claims are all invalid under Beezer. And the proceedings that involved Beezer, and that invalidated all these claims under Beezer, do not involve this claim construction issue at all. So, there are essentially two alternative arguments that do not implicate the alleged disclaimer. Okay. If the court has further questions on any of these issues, I'm happy to take them. Otherwise, I'll yield back the balance of my time. Any questions? Nope. Any further questions? Okay. I think we're all right. Thank you, Mr. O'Quinn. Thank you, Judge Newman. Mr. Timofey. Judge Timofey. On the printed publication, very briefly, with respect to the evidence by Apple's expert, again, he only testified that he read the RFC publications. He discussed them. He never testified that he had familiarity with the publishing process. There was no testimony from him that he actually knew how the Internet Society Task Force assigned those dates and what the date on the cover meant. RFC-2026, as I already mentioned, does not say anything about the date that appears on the cover of the RFC. And as my colleague mentioned, what's striking is that he actually emphasizes the evidence that the board said they did not need to consider, the Genoza evidence. So, again, our position is that this court really should not countenance the board shirking the evidential requirements if there is indeed this highly probative evidence, as my colleague argues, that the date can be established and the public dissemination as of November 1998 can be established, then this court should remand to the board so it can consider whether that evidence is admissible and whether, indeed, that evidence is as strong as Apple argued. Turning to the questions of inherency in DASR, with respect to the question of the server limitation, I think, actually, that issue is, I spoke about it very briefly only because, in our view, it's fairly clear. The court only needs to look at what was the supporting evidence before the board that the disclosure of an originating device being a Web TV or similar device necessarily means the terminating device must be a server. And that evidence was, it's on appendix page 6675, it's paragraph 289 of the declaration of Apple's expert. And that declaration simply says that the Web TVs and similar devices could be used to connect to a server. There was no evidence that, indeed, those devices would necessarily connect to a server. So the board made an inferential leap that is not supported by the evidence. That is with respect to the argument concerning the server limitation in DASR. With respect to the argument about the broadband, what the reason that Apple actually argued inherency, because if the court looks at, if the court looks on page, just a second, if actually the court looks on page J49 in the 810 proceeding, the board itself clearly said that the 705 patent required that there be separate channel in a modulated link in order for the broadband communication to be met. There is no testimony that, in fact, the DASR disclosed those separate channels. If this court looks at appendix 6584, paragraph 80 of Dr. Tomasi's declaration, he only testifies that there were modulated signals in DASR. Therefore, there was no testimony about DASR disclosing the separate channels. That's why the board applied inherency. When the board changed the disclaimed inherency, which is what Apple argues, and you can see it on page appendix 1229, Apple argues that, used the word necessarily to describe the inherency argument. Once the board disclaimed inherency, there was really no evidence to support the obviousness finding because that obviousness finding depended on inherency. On Aventail, we think, irrespective of the differences in the record, there was a clear disclaimer that Apple itself has described as a clear mandate and that it's successfully enforced. So we think that that disclaimer, the very priority issue in this proceeding, should govern. There we quickly could respond to Judge Lurie's earlier question. Actually, one of the reasons that Fornetics listed 70 references is because it included references that Apple and other defendants in the parallel district court infringement proceedings and also in other IPR and re-examination proceedings have raised. So that's one of the reasons for such a large number. Unless there are any other questions, my time expires. Any questions for counsel? Thank you. Thank you both. The case is taken under submission.